IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

97 JUL 11  AM 10: 5

U.S. DISTRICT COURT
N.D. OF ALABAMA

LINDA K. DAVIS and VICTORIA
L. JERIC,                          )
                                   )
        Plaintiffs,                )
                                   )
v.                                 )     CV95-H-3150-NE
                                   )
INTERGRAPH CORPORATION,            )
                                   )
        Defendant.                 )

**ENTERED**

**JUL 1 1 1997**

MEMORANDUM OF DECISION

Presently before the Court is the January 10, 1997 motion

for summary judgment filed by defendant.  Pursuant to Orders

entered January 15, January 17, February 26, March 27, April 22,

and May 23, 1997, the motion was deemed submitted, without oral

argument, on June 13, 1997.

I. Procedural History

This action was commenced by four plaintiffs -- Jana

Baudendistel, Linda Davis, Janet McDonald, and Victoria Jeric --

all of whom joined in a complaint filed in this Court on December

6, 1995.  The complaint alleged that Intergraph had discriminated

against each of the plaintiffs on the basis of gender, with

respect to pay, promotions, and work assignment opportunities.[1] In addition, the complaint alleged that plaintiffs had complained about gender discrimination to Intergraph's management, and had been retaliated against with respect to performance evaluations and other terms and conditions of employment. Three plaintiffs -- Jeric, McDonald, and Baudendistel -- asserted constructive discharge claims. The complaint sought relief under Title VII of the Civil Rights Act of 1964 and the Equal Pay Act.

After discovery was completed, defendant filed the present motion on January 10, 1997. However, before any evidence or briefs were submitted, the parties requested a stay of these proceedings to allow for mediation under this District's Alternative Dispute Resolution Plan. The Court granted several successive stays to accommodate this request, and two plaintiffs -- Baudendistel and McDonald -- were successful in reaching a settlement of their claims against defendant. Thus, only the

---

[1]More specifically, with respect to the work assignment claims, the complaint asserted that plaintiffs had been denied "unique career-making opportunities." As the Court understands this claim, plaintiffs allege that they were deprived of "team leader" or "project manager" positions with respect to particular projects for Intergraph's clients, or were deprived of work assignments that would have involved frequent client contact or special opportunities for experiences that would have enhanced their careers.

claims of plaintiffs Jeric and Davis remain.

In support of its motion for summary judgment, Intergraph filed a "statement of uncontested facts," a principal brief, a reply brief, and an evidentiary submission consisting of 49 exhibits.  Plaintiffs opposed the motion by filing their own "motion in opposition to motion for summary judgment,"[2] principal and reply briefs, and an evidentiary submission consisting of 26 exhibits.  It is important to note that Intergraph's motion does not seek summary judgment on all of plaintiffs' claims.  Rather, the motion seeks summary judgment with respect to (1) all Title VII claims arising out of incidents that occurred prior to November 17, 1993; (2) all Equal Pay Act claims; (3) all Title VII claims arising out of allegations of unequal pay; (4) plaintiffs' retaliation claims; and (5) plaintiff Jeric's constructive discharge claim.  The present motion does not address plaintiffs' claims that they were denied promotions and work assignments because of their gender.

_____

[2]This "motion in opposition" was not necessary -- plaintiffs should have opposed the motion for summary judgment simply by filing evidence and briefs.

3

## II. Standards for Evaluating a Summary Judgment Motion

The Eleventh Circuit has stated that district courts should use caution when taking employment discrimination cases away from the jury by means of summary judgment. Isenbergh v. Knight-Ridder Newspaper Sales, Inc., 84 F.3d 1380, 1384 (11th Cir. 1996). However, the Eleventh Circuit also recognizes that "[s]ummary judgments . . .are not rare in employment discrimination cases." Earley v. Champion International Corp., 907 F.2d 1077, 1080. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which is designated 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed.R.Civ.P. 1). Given the ease of complying with the notice pleading requirements in asserting a discrimination claim, the Eleventh Circuit encourages district courts that "plaintiffs seeking to avoid summary judgment should be strictly held to the requirements of Rule 56(e); the plaintiff must present specific non-conclusory facts that would support a jury verdict against the particular defendant on discriminatory intent." Ratliff v. DeKalb County, 62 F.3d 338, 341 (11th Cir.

4

1995).

Where a plaintiff's discrimination claim is based on circumstantial evidence, the court employs the shifting-burden framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). First, the plaintiff has the burden of establishing a prima facie case of discrimination.[3] Second, after plaintiff has presented a prima facie case, the burden of production shifts to the defendant, requiring an articulation of some "legitimate, nondiscriminatory reason" for the alleged discriminatory employment action. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). "[I]t is possible for the defendant to present such strong evidence of a nondiscriminatory rationale that summary judgment is warranted." Brown v. American Honda Motor Co., Inc., 939 F.2d 946, 950 (11th Cir. 1991), cert. denied, 502 U.S. 1058 (1992) (quoting Grigsby

---

[3] In order to present a prima facie case of discrimination, plaintiff must show: (1) that he or she belongs to a protected class; (2) that he or she either applied and was qualified for a position for which the employer was seeking applicants or was satisfactorily performing the duties of the job; (3) that he or she was rejected or terminated; and (4) that, after the rejection, the position remained open and the employer continued to seek applicants for persons of plaintiff's qualifications. McDonnell Douglas, 411 U.S. at 802. Based on O'Connor v. Consolidated Coin Caterers Corp., ____ U.S. ____, 116 S.Ct. 1307, 1310 (1996), plaintiff need not show that the position at issue was filled by a person outside the protected class.

v. Reynolds Metals Co., 821 F.2d 590, 596 (11th Cir. 1987)).

Once the defendant presents legitimate, nondiscriminatory
reasons for its action, then the plaintiff must prove by a
preponderance of the evidence that the reasons offered by the
defendant are a mere pretext for discrimination, and to persuade
the fact-finder that the defendant intentionally discriminated
against the plaintiff.  McDonnell Douglas, 411 U.S. at 804.   In
other words, "[a]fter a Title VII plaintiff makes out a prima
facie case, and the defendant produces a legitimate
nondiscriminatory explanation for its actions, the McDonnell-
Burdine presumption drops from the case.  "At that point, the
inquiry is whether the defendant intentionally discriminated
against the plaintiff."  Harris v. Shelby County Board of
Education, 99 F.3d 1078, 1083 (11th Cir. 1996).

"[B]ecause the plaintiff bears the burden of establishing
pretext [for discrimination], he must present 'significantly
probative' evidence on the issue to avoid summary judgment."
Isenbergh v. Knight-Ridder Newspaper Sales, Inc., 97 F.3d 436,
444 (11th Cir. 1996) (quoting Young v. General Foods Corp., 840
F.2d 825, 829 (11th Cir. 1988) (other citations omitted)
(alterations in original).  "At the summary judgment stage, once
an employer articulates a legitimate, nondiscriminatory reason

for the discharge, the burden shifts back to plaintiff to raise a genuine factual question as to whether the stated reason is mere pretext." Cortin v. Southland Int'l Trucks, 25 F.3d 1545, 1550 (11th Cir. 1994); Hairston v. Gainesville Sun Publ. Co., 9 F.3d 913, 920 (11th Cir. 1993).

Plaintiff may prove that the defendant intentionally discriminated against him either "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy or credence." Carter v. City of Miami, 870 F.2d 578, 584 (11th Cir. 1989).   "If the defendant's proffer of credible, nondiscriminatory reasons for its actions is sufficiently probative, then the plaintiff must come forward with specific evidence demonstrating that the reasons given by defendant were a pretext for discrimination." Brown, 939 F.2d at 950.   "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, non-discriminatory reasons for its actions." Isenbergh, 97 F.3d at 444 (quoting Young, 840 F.2d at 830).

### III. Relevant Undisputed Facts

Here, the Court will recite some of the undisputed facts provided by the parties' evidentiary submissions.  However, because of the limited nature of the present motion, the Court will not address facts relevant only to plaintiffs' claims of discrimination in job assignments and promotions.  In addition, to avoid repetition, the Court will defer a recitation of the facts regarding the pay received by plaintiffs and alleged male comparators until its discussion of the disparate pay claims below.

Intergraph is a company that designs computer applications and markets software and hardware for certain engineering disciplines.  (Nawrocki Depo. at 25).  It has a facility in Huntsville, Alabama, where both plaintiffs were employed. Intergraph groups its employees into various job classifications, each of which is assigned a particular pay grade.  (Brown Aff.). Higher-paid jobs are assigned lower pay grade numbers, such that Intergraph's chief executive officer is a grade 0, while maintenance helpers and cafeteria helpers are within grade 9. (Id.).  The job titles and pay grades relevant to this case are as follows, in descending order:

8

| 2B | Senior System Consultant |
| 3B | Software Consultant / System Consultant |
| 4A | Senior Software Analyst / Senior System Engineer |
| 5A | Software Analyst / System Engineer |

(Brown Aff.). Within each pay grade, Intergraph sets employees'
pay based on education, experience, performance, and seniority
with the company. (Id.).

Plaintiff Davis began her employment with Intergraph on
February 27, 1989 as a software analyst. (Davis' employee
profile). At this time, she received a salary of $560 per month.
(Id.). She had received a B.S. degree in computer science from
Murray State University in 1988, and she testified in her
deposition that this was her first computer-related job. (Id.;
Davis Depo. at 14-15). Davis received four performance
evaluations between 1989 and 1996, and received an "excellent" or
"solid" rating on each. (Davis' employee profile).[4] Davis also
received nine pay increases and three promotions between 1989 and
1996; her current position is that of system consultant, at a
salary of $992 per month. (Brown Aff.). Davis is still employed

---

[4] Under Intergraph's evaluation method, "excellent" is the
best evaluation, and "solid" is one step below "excellent."
Other possible ratings include "adequate" and "marginal."

9

at Intergraph.

Plaintiff Jeric began her employment at Intergraph on May 18, 1992 as a software consultant. (Jeric's employee profile). Prior to beginning work at Intergraph, Jeric had received a B.A. degree in Informational Services and a B.S. degree in computer science. (Id.). In addition, she had approximately 11 years' experience in computer programming, and six years' experience as a senior software engineer. (Id.). Jeric's starting salary was $925 per week. (Id.). Her salary was increased to $955 per week in August 1993, and she was "reclassified" as a senior systems engineer. (Id.).[5] Jeric resigned from Intergraph on May 31, 1994, and on her exit interview form cited "the continuing environment of discrimination and retaliation" as her reason for leaving. (Plaintiffs' ev. submission, ex. S). She had received, on May 5, 1994, an offer of employment from another computer firm in Virginia, which promised her a salary of $1038 per week. (Plaintiffs' ev. submission, ex. 31).

Both plaintiffs worked in the Solutions Engineering Division ("SED") of Intergraph. (Plaintiffs' ev. submission, Ex. H). One

---

[5]In August 1993, Intergraph "reclassified" most or all of its employees, resulting in many job title changes at that time. Plaintiff characterizes her "reclassification" in August 1993 as a demotion motivated by gender.

10

of the departments within SED was the GEO systems department,

headed by Lon Opp.  (Id.).  Plaintiffs worked in this department,

and were supervised directly by Baraq Hadi.  (Id.).

Plaintiffs have introduced evidence indicating a poor

attitude about women on the part of both Opp and Hadi.  (See,

e.g., Smith Depo. at 19-20, 71-72, 94-95, 139; Davis Depo. at

146-47; Nawrocki Depo. at 258-59, 262-65).  For example, Opp

reportedly said one several occasions that "he did not feel

comfortable hiring women consultants, because he thought they

would simply have children, and then ... you could not send them

to customer sites."  (Smith Depo. at 95).  The Court acknowledges

the presence of this evidence, but will not examine it in great

detail, since Intergraph has not moved for summary judgment on

the basis of a lack of evidence of discriminatory intent.

## IV. Analysis

Intergraph's motion for summary judgment makes four major

arguments: (1) certain aspects of plaintiff's Title VII and Equal

Pay Act claims are barred by the statute of limitations; (2)

plaintiffs were not, in fact, paid less than similarly-situated

male employees; (3) there is no evidence of retaliation; and (4)

plaintiff Jeric was not constructively discharged.    The Court

examines each of these arguments in turn.


A. Statute of Limitations


        Plaintiffs filed their EEOC charges on May 16, 1994.    Under

Title VII, a plaintiff must file a charge of discrimination

within 180 days of the act giving rise to the charge.    42 U.S.C.

§ 2000e-5(e).    Plaintiffs have asserted numerous discriminatory

acts occurring more than 180 days prior to May 16, 1994.

(Plaintiffs' response to interrogatory #11).    Intergraph takes

the position that these claims are barred by Title VII's statute

of limitations; plaintiffs contend that, because there was a

"continuing violation" of Title VII, the 180-day period does not

apply.

        It appears clear to the Court that plaintiffs' claims of

discrimination in wages represent an alleged continuing

violation.    In Calloway v. Partners Nat. Health Plans, 986 F.2d

446 (11th Cir. 1993), the Eleventh Circuit held that

"discriminatory wage payments constitute a continuing violation

of Title VII."   Id. at 449.    Plaintiffs' claims that they were

paid less because of their gender are not barred by the statute

of limitations.

However, it is equally clear to the Court that plaintiffs' remaining claims do not allege continuing violations of Title VII. Plaintiffs' remaining Title VII claims consist of allegations that, on numerous occasions, they were denied specific promotions and specific work assignment opportunities because of their gender. (Plaintiffs' response to interrogatory #11). Plaintiffs seek to avoid the application of the 180-day limitations period by characterizing these acts of discrimination as continuing symptoms of a hostile work environment filled with discrimination.[6] Plaintiffs' allegation, however, does not transform these discrete, permanent acts of discrimination into a single continuing violation.

Under the Eleventh Circuit's continuing violation analysis, a court should look at whether the alleged discriminatory incidents "were related in subject matter, frequency, and permanence." Roberts v. Gadsden Memorial Hosp., 835 F.2d 793, 800 (11th Cir. 1988). Of these factors, the "permanence" of the employment decisions is the most important. Id. at 801. The

---

[6]Although both parties repeatedly refer to a "hostile work environment" claim, there is no such claim alleged in the complaint.

13

Court need not exhaustively analyze these three factors in this
case, however, because the Eleventh Circuit held in <u>Roberts</u> that
a series of denied promotions does not constitute a continuing
violation:

> The District Court essentially found a
> continuing violation based solely on the
> identity of employee and employer. The court
> appeared to reach this conclusion because the
> effect of the discriminatory incidents was
> the same: the job wrongfully went to a
> lesser-qualified white man each time. The
> District Court erred as a matter of law in
> considering the continuing effects of time-
> barred acts in deciding whether a nexus
> between the two acts existed.

<u>Id.</u> at 801.

Here, each of the employment decisions plaintiffs complain
of -- promotions that were denied and work assignments they did
not receive -- was a discrete, permanent employment action that
should have triggered plaintiffs' awareness of and duty to assert
their rights. Although the acts were related in the sense that
they all may have been reflections of the discriminatory
attitudes of plaintiffs' supervisors, this relationship, under
<u>Roberts</u>, in insufficient to invoke the continuing violation
doctrine. In addition, each instance of a denied promotion or
denied work assignment would entail a separate factual inquiry
that compared the plaintiff affected with the person who actually

14

received the promotion or work assignment, together with an analysis of the requirements of the job (for a promotion claim) or the special circumstances of the work assignment in question.

For these reasons, the Court believes that plaintiff's Title VII claims are not properly characterized as a single continuing violation.  Rather, each plaintiff claims a series of discrete, permanent discriminatory acts.  Because plaintiffs' claims are not for a continuing violation, any claims of discrimination (except with respect to unequal pay) that arise from acts occurring prior to November 17, 1993 are barred by the statute of limitations, and defendant's motion for summary judgment is due to be granted with respect to those claims.

Intergraph also argues that certain of plaintiffs' Equal Pay Act claims are barred by the two (or three) year statute of limitation in 29 U.S.C. § 255.  Intergraph contends that plaintiffs cannot recover for any inequality in wages that occurred more than three years prior to the filing of this complaint.  Plaintiffs, relying on Mitchell v. Jefferson County Board of Education, 936 F.2d 539 (11th Cir. 1991), contend that their Equal Pay Act claims are properly characterized as a continuing violation, allowing them to ignore the limitations period.  Plaintiffs' argument is unfounded.

15

In <u>Mitchell</u>, the Eleventh Circuit addressed the issue of whether an employee's claim of disparate pay was barred when the disparity in pay began outside the limitations period, but continued into the period.  <u>Id.</u> at 548.  The Court held that an inequality in pay was a continuing violation, and reasoned that, absent application of the continuing violation doctrine, an employer who succeeded in discriminating in wages for more than two years would be forever insulated from suit.  <u>Id.</u>

Here, however, Intergraph does not argue that plaintiffs' claims are barred in their entirety; Intergraph takes the position that plaintiffs' claims may only go back three years from the filing of the complaint.  <u>Mitchell</u> does not stand for the proposition that plaintiffs may avoid the limitations period under the EPA in every case under the continuing violation doctrine; it simply holds that an employee's claims are not barred entirely by the statute when the disparity in pay began outside the limitations period.  In <u>Hodgson v. Behrens Drug Co.</u>, 475 F.2d 1041 (5th Cir. 1973), the precedent relied upon in <u>Mitchell</u>, the former Fifth Circuit applied the same continuing violation theory to claims under the Equal Pay Act, but then went on to hold that "wages due under the Act for the two years preceding this suit are recoverable."  <u>Id.</u> at 1051.

Hodgson makes it clear that plaintiffs may not avoid application of the two (or three) year statute of limitations applicable to Equal Pay Act claims. Any Equal Pay Act claim arising before December 6, 1992 is barred by the statute of limitations, and defendant's motion for summary judgment is due to be granted with respect to those claims.

## B. Equal Pay Act and Title VII unequal pay claims

The primary ground for argument between the parties concerns plaintiffs' claims of gender-based inequalities in pay, under both Title VII and the Equal Pay Act.

In order to make out a prima facie case under the Equal Pay Act, a plaintiff must show: (1) that she receives lower pay than a male co-employee; and (2) that she performs work that is substantially equal in skill, effort and responsibility under similar working conditions.[7] Mulhall v. Advanced Security, Inc., 19 F.3d 586 (11th Cir. 1994); Waters v. Turner, Wood & Smith Insurance Agency, Inc., 874 F.2d 797 (11th Cir. 1989). The

---

[7] The Equal Pay Act recites the standard as "equal work on jobs the performance of which require equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1).

17

Eleventh Circuit has recognized that "[t]he standard for determining whether jobs are equal in terms of skill, effort, and responsibility is high." <u>Waters</u>, 874 F.2d at 799.  And, once a <u>prima facie</u> case is established, the burden shifts to the defendant to establish one of the four statutory affirmative defenses.  <u>Mitchell v. Jefferson County Board of Education</u>, 936 F.2d 539, 547 (11th Cir. 1991).  The defense relied upon by Intergraph here is the "catch-all" defense that the differential in pay is "based on any other factor other than sex."  29 U.S.C. § 206(d)(1)(iv).

The Eleventh Circuit has held that there are two differences between an Equal Pay Act claim and a Title VII claim based on gender discrimination as to wages.  <u>Mulhall v. Advance Security, Inc.</u>, 19 F.3d 586, 597-98 (11th Cir. 1994).  First, because Title VII includes no "establishment" requirement, the standard of similarity between jobs is relaxed under Title VII for the presentation of a prima facie case.  <u>Mulhall</u>, 19 F.3d at 598. Plaintiff must show that her job was "similar" to higher paying jobs occupied by males,[8] rather than showing the jobs to be

---

[8]  In <u>Mulhall</u>, the Eleventh Circuit stated that "[t]he absence of the establishment requirement permits the plaintiff to make a Title VII prima facie case on the showing that she is a female and her job was **substantially similar** to higher paying

18

substantially identical or substantially equal as required under the Equal Pay Act. Id. Second, plaintiff must prove discriminatory intent. Id. at 597.

Despite these differences in the law applicable under the Equal Pay Act and Title VII, the Court will analyze plaintiffs' claims together. The parties have focused their briefing entirely on the issue of whether there were, in fact, similarly-situated male employees who received greater pay than plaintiffs. In doing so, Intergraph relied upon plaintiffs' response to interrogatory #11, which listed ten male comparators for plaintiff Davis and three for plaintiff Jeric. Intergraph also listed several additional comparators of its own with respect to each plaintiff, in an effort to show male employees who were paid

---

jobs occupied by males." Mulhall v. Advanced Security, Inc., 19 F.3d 586, 598 (11th Cir. 1994) (emphasis added). However, in previous Eleventh Circuit cases the court has identified the burden for a female Title VII plaintiff establishing a prima facie case of sex discrimination as requiring only a showing that she occupied a job **"similar** to that of higher paid males." Meeks v. Computer Associates Int'l. 15 F.3d 1013, 1019 (11th Cir. 1994) (emphasis added); see also, Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1529 (11th Cir. 1992). This Court does not believe that Title VII allows comparison of jobs with only slight or de minimis similarities. However, because the Eleventh Circuit has used the phrase "substantially similar" to identify the burden of proof in Equal Pay Act claims and has expressly held that the burden of similarity under Title VII is more relaxed, when forced to choose among the two standards, this court must apply the mere "similar" requirement.

less than plaintiffs.

In their brief, plaintiffs do not address some of the comparators listed in their response to interrogatory #11, each of which was argued by Intergraph to be an inappropriate comparator.  Intergraph's arguments with respect to these individuals were sufficient to show that they were not similarly situated, and plaintiffs' failure to argue the propriety of these alleged comparators in their briefs leads the Court to believe that plaintiffs have abandoned their attempt to show disparate pay based on these individuals.  Thus, the Court will not discuss these alleged comparators.

In addition, plaintiffs have added comparators in their briefs that were not listed in their response to interrogatory #11.  Because plaintiffs had not listed these in their interrogatory response, and have never supplemented that response, the Court views it as unfair to allow plaintiffs to force defendants to argue the comparators listed and then abandon those in favor of newly-discovered comparators.  Thus, the Court will limit its discussion to male comparators that are both listed in plaintiffs' response to interrogatory #11 and that were discussed in plaintiffs' briefs.  The Court will also discuss some of the male comparators offered by Intergraph.

1. Plaintiff Davis

Plaintiffs' response to interrogatory #11 listed ten men who allegedly received greater pay than plaintiff Davis for similar work: David Neubart, Reza Chaichi, Baraq Hadi, Jerry Golden, Mike Belt, Mike Woods, Leonard Pastula, Jay Morgan, Mark Vaske, and Prasad Surpaneni.  Of these, only Mike Woods and Mike Belt are mentioned in plaintiff's brief.

Davis was hired by Intergraph on February 27, 1989.  She had a B.S. degree in computer science, but had no experience in computer programming at that time.[9]  She was hired as a software consultant and initially received a salary of $560 per week.  The following chart shows Davis' salary history at Intergraph:

| Date | Position | Weekly Salary |
|------|----------|---------------|
| 2/27/89 | Software Analyst | $560 |
| 1/27/90 | Software Analyst | $605 |
| 2/16/91 | Software Analyst | $660 |
| 8/31/91 | Senior Software Analyst | $720 |
| 9/5/92 | Senior Software Analyst | $756 |
| 8/28/93 | Senior Systems Engineer | $756 |

---

[9]All of the information about employees in the following discussion is drawn from the employee profiles produced by Intergraph, unless otherwise noted.

| 9/4/93 | Senior Systems Engineer | $796 |
| 9/25/94 | Senior Systems Engineer | $820 |
| 12/17/94 | System Consultant | $861 |
| 9/9/95 | System Consultant | $947 |
| 9/7/96 | System Consultant | $992 |

Mike Woods was hired by Intergraph one month after plaintiff
was hired, and his initial position was that of software analyst,
like plaintiff Davis. Woods had received a B.S. degree in
computer engineering from Auburn University, as well as an M.S.
degree in computer science, also from Auburn. He had no
significant experience. His initial salary was $640 per week,
which was increased to $756 per week on February 23, 1991.[10]
Woods was promoted to the position of senior software analyst on
February 22, 1992, and his salary was increased to $816 weekly.
Woods received another raise on March 20, 1993, to $851 per week.
Woods was reclassified as a System Consultant on August 28, 1993,
and received a pay increase on October 30, 1993 to $891 weekly.
Woods became a manager on June 18, 1994, and after that point,
can no longer be compared to plaintiff Davis.

_____

[10]The affidavit of Robert Brown recites that the $700 figure
listed on Woods' employee profile is an error; $756 is the
correct figure.

The salary figures make it clear that Woods, at several times between 1989 and 1994, held the same position as plaintiff, but received higher pay.  However, the record reveals a legitimate, non-discriminatory reason for the difference in pay: Woods, unlike plaintiff, had received a master's degree in computer science, a degree that was directly related to his duties at Intergraph.  Since it is undisputed that Intergraph used education level as a factor in setting pay within the various pay grades, (see Brown Aff.), Woods' higher level of relevant education carries Intergraph's burden of showing that the pay disparity was attributable to some factor other than sex.  Plaintiff Davis' claims cannot rely on Woods as a comparator.

Mike Belt was hired by Intergraph as a system consultant on December 3, 1990.  He had a B.S. degree in physics and an M.S. degree in systems management.  Belt's starting salary was $900 per week, which was increased to $936 on February 15, 1992.  He received another raise on August 7, 1993 to $966 per week.  On August 6, 1994, Belt's salary was increased to $1000 per week, and Belt was terminated due to a reduction in force on July 25, 1995.

Belt, however, is a wholly inappropriate comparator. Initially, Belt had a master's degree, while plaintiff possessed

23

only a bachelor's degree. In addition, Belt was hired as a
System Consultant in December 1990, at a time when plaintiff
Davis was a software analyst -- s different job on a lower pay
grade, and with different responsibilities. When plaintiff was
promoted to her consultant position, in December 1994, Belt had
been in the consultant pay scale for four years, which readily
explains why his pay at that time was higher than plaintiff's.
The undisputed evidence in the record indicates that Intergraph
took education and seniority within a position into account when
determining salaries, and there is no evidence in the record to
call into question these legitimate explanations for Belt's
higher rate of pay.

Intergraph has also offered several male employees as
comparators, each of whom made less money than plaintiff; the
Court discusses two of these for illustrative purposes. The
first comparator, Christopher Ansell, was a senior system
engineer (like plaintiff Davis) from March 19, 1994 onward.
During the time that plaintiff and Ansell held the same position,
Ansell was paid $730 per week; plaintiff made $796, then $820.
Plaintiff argues that Ansell is an inappropriate comparator,
because plaintiff had been with Intergraph since 1989, while
Ansell did not begin working there until 1993. Plaintiff asserts

24

that her superior experience and seniority commanded a higher
salary than Ansell, and so Ansell was not similarly situated.
While it is true that plaintiff had been at Intergraph four years
longer than Ansell, plaintiff came to Intergraph with no
experience, while Ansell had worked for approximately two and
one-half years as a software engineer prior to his employment at
Intergraph.   More importantly, however, plaintiff's point that
she had superior experience and seniority is self-defeating: the
fact that Ansell had less experience and seniority, and received
less money than plaintiff, serves to illustrate that the
disparities in pay within pay grades were actually the result of
legitimate factors, such as education, experience, and seniority.
Ansell's lower rate of pay is strong evidence that Intergraph's
pay scales were set with regard to legitimate factors, not
gender.[11]

The next comparator suggested by Intergraph is Srinivasa
Katragadda.   Katragadda, who had a masters' degree in electrical

---

[11]Plaintiff also argues that gender discrimination can be
inferred from the fact that Ansell's starting pay as a software
analyst, $670 per week, was higher than her salary for her first
two and one-half years at Intergraph.  Again, the evidence
permits no such inference, because plaintiff started at
Intergraph with no experience, while Ansell had two and one-half
years' experience.

engineering, was hired as a senior software analyst on December
30, 1990.[12]  At that time, his salary was $650 per week, and he
received a pay increase to $685 per week on December 4, 1991.
His salary was increased again on December 26, 1992, to $715
weekly.  He was reclassified as a system engineer on August 28,
1993, and his pay was increased to $740 per week on December 25,
1993.  He received a final pay increase on May 20, 1995 to $760
per week, and resigned from Intergraph on December 1, 1995.
Katragadda's performance reviews were "adequate," "solid," and
"adequate."  When he resigned, it was noted that he was not
eligible for rehire because he lacked the ability to solve common
problems.

Both Katragadda and plaintiff Davis held the same position
-- senior software analyst -- from August 31, 1991 until August
28, 1993.  During that time period, Davis earned between $720 and
$756 per week, while Katragadda earned between $650 and $715
weekly.  Plaintiff argues that Katragadda is an improper
comparator, because she had been with Intergraph longer than
Katragadda and because her performance reviews were better.
Again, however, plaintiff's arguments simply serve to undercut

---

[12]All of the information about Katragadda is taken from his
employee profile.

26

her claim of gender discrimination in pay.  The fact that

Katragadda had less seniority, inferior performance, and a lower

salary when compared to plaintiff only demonstrates that

Intergraph's system of determining salaries was, in fact, based

on legitimate factors.[13]

So, to conclude, the undisputed evidence in the record

indicates that plaintiff Davis received lower pay than male

employees who had superior experience, seniority, and/or

education.  However, Davis' salary was greater than those males

with less experience and seniority and whose performance

evaluations were less favorable.  The undisputed evidence in the

record permits only one conclusion: that Intergraph's salary

decisions were influenced by legitimate factors, and that

plaintiff Davis' salary was not lower because of her gender.

Thus, defendant's motion for summary judgment is due to be

granted with respect to Davis' Title VII claims based on unequal

---

[13]One argument that resurfaces frequently in plaintiffs'
brief is that plaintiff Davis, although classified as a senior
system engineer, was in fact performing the work of a consultant.
The Court notes this assertion in plaintiffs' brief, but also
notes that plaintiffs' brief refers the Court to no evidence to
establish this as a fact, disputed or otherwise.  The Court's
comparison of plaintiff Davis with male Intergraph employees has
focused almost exclusively on job titles because the parties have
not directed the Court to any evidence regarding plaintiffs'
actual job duties as compared to those of male employees.

pay and with respect to Davis' Equal Pay Act claims.[14]


## 2. Plaintiff Jeric


Plaintiff Jeric received two bachelor's degrees: one in informational services and one in computer science. Prior to starting work at Intergraph, she had approximately ten and one-half years' experience in computer programming, and six years of

---

[14]In plaintiffs' brief, Davis compares herself to another male employee, Tommy Siniard. Because Siniard was not listed in Davis' response to interrogatory #11, the Court believes that it was improper for Davis to make arguments regarding Siniard without supplementing her pervious response. However, even if it were proper to consider Siniard as a comparator, it is clear that his higher salary was the result of legitimate factors, not gender discrimination. Siniard was hired at Intergraph about two months before plaintiff Davis began her employment, and his starting salary -- $820 per week -- was much higher than Davis'. (Siniard's employment information is attached to plaintiffs' evidentiary submission as exhibit F). However, Siniard had approximately eight years' experience in computer programming prior to his employment at Intergraph, compared to plaintiff's lack of any experience. In addition, at all times, Siniard occupied a higher position within Intergraph's structure than Davis. Siniard was hired as a senior software analyst, while plaintiff was a software analyst when she was hired. When plaintiff Davis was promoted to senior software analyst, Siniard was in the position of software consultant. In any event, Davis cannot rely on Siniard's higher pay as evidence of gender discrimination, because it is undisputed that Siniard had eight years of computer programming experience when he was hired, while plaintiff had none.

that experience was as a senior software engineer.[15]   She was
hired by Intergraph on May 18, 1992 as a software consultant, at
a salary of $925 per week.  Her pay was increased to $955 per
week on August 14, 1993, and her position was reclassified to
that of senior system engineer on August 28, 1993.  She resigned
from Intergraph on May 31, 1994.

       In her response to interrogatory #11, Jeric listed three men
who allegedly received higher pay than she did for comparable
work: David Neubart, Mike Belt, and Len Pastula.  Mike Belt is
not mentioned in plaintiffs' brief, so the Court will not discuss
him as a potential comparator.

       David Neubart had a bachelor's degree in systems science,
and had worked for approximately eleven years in communications
and data services at GTE prior to coming to Intergraph.  He
served as lead engineer for seven of those eleven years.  Neubart
was hired as a senior system consultant on January 7, 1991, at a
starting salary of $900 per week.  His pay was increased to $936
per week on April 25, 1992.  Neubart was given three performance
reviews by Intergraph -- "solid," "marginal," and "marginal," and
was discharged on July 16, 1993 for poor work performance.

_____

       [15]All of the information about Jeric is taken from her
employee profile.

29

Neubart's employee profile makes it evident that he is not a proper comparator for Jeric to use in demonstrating gender-based pay decisions. Neubart occupied a position -- senior system consultant -- that was in a higher pay grade than Jeric's software consultant position. Despite this critical distinction, Neubart worked at a salary of $900 per week for his first fifteen months at Intergraph, while Jeric's starting salary was $925. Even after Jeric was "demoted" to the position of senior system engineer, she was earning more -- $955 per week -- than Neubart was ever paid by Intergraph. The fact that Neubart was paid $11 more per week than plaintiff between May 1992 and July 1993 supports no inference of gender discrimination in pay, because Neubart held a higher position than Jeric did. Despite this higher position, the fact that Jeric's starting salary was higher than Neubart's tends to prove that Intergraph did not discriminate against Jeric with respect to pay according to her gender.

Len Pastula held both a bachelor's and a master's degree in electrical engineering from Penn State. Pastula had at least ten years' experience[16] in systems engineering prior to coming to

_____

[16]Pastula's employee profile lists prior employment from February 1982 to November 1992, but also notes that Pastula had

30

Intergraph, and six and one-half of these years were as a senior
system engineer or engineering supervisor. He was hired by
Intergraph on November 16, 1992 as a software consultant, and his
starting salary was $1058 per week. His salary was increased to
$1093 per week on November 13, 1993.

Although Pastula was in the same position as plaintiff, and
made a higher salary, it is undisputed that Pastula's educational
background -- a master's degree -- was superior to Jeric's. In
addition, Pastula's had prior experience as a engineering
supervisor, which Jeric did not. It is undisputed that Pastula
was performing work as a project manager for Intergraph, which
Jeric was not. (Jeric Depo. at 283). Given these differences
between Pastula and Jeric, Pastula's higher rate of pay supports
no inference of gender discrimination.

Intergraph has also proposed several of its own male
comparators with respect to Jeric, and the Court will discuss two
of these as examples. David Hamil, who held both bachelor's and
master's degrees in computer science, came to Intergraph with

---

worked as a sales manager for CYBEX, a systems development
engineer on an SCI contract, and as a systems analyst for Perkin-
Elmer. Pastula received his master's degree in 1972, and so the
Court assumes that this additional work experience came in the
years between 1972 and 1982.

31

eight years' experience, four of which were as a "principal programmer analyst."  Hamil was hired by Intergraph as a software consultant on December 2, 1991, at a starting salary of $870 per week.  His salary was increased to $898 weekly on January 23, 1993, and to $943 per week on March 14, 1994.

Clearly, while Hamil and Jeric were both employed at Intergraph, Jeric made a substantially higher salary.  Plaintiff argues that she had superior experience as a senior software engineer, and so commanded a higher salary.  This argument, like those advanced by plaintiff Davis, serves to undermine plaintiff's case, not advance it.  The fact that Jeric had more experience than Hamil and received concomitantly higher pay does not negate Intergraph's argument that its pay scale was, in fact, based on factors such as experience and education.[17]

---

[17]Plaintiff also argues that gender discrimination can be inferred from the fact that Hamil's salary was increased to $983 per week in March 1995, and to $1028 per week in March 1996; these amounts exceed plaintiff's highest salary of $955 per week. This argument's weakness mirrors the weakness of Jeric's unequal pay claims generally.  The fact that Hamil's salary was higher beginning one year after Jeric resigned does not show that Hamil received higher pay for comparable work.  By the time Hamil's pay exceeded plaintiff's highest rate of pay at Intergraph, Hamil had been with the company as a consultant for over three years. Jeric was employed by Intergraph for only two years.  The fact that it took Hamil three years with Intergraph to exceed the salary Jeric received after eighteen months with the company does not suggest discrimination.

32

Another comparator advanced by Intergraph is Thomas Clarry.
Clarry had a B.S. degree in chemical engineering and no computer-
related experience when he started at Intergraph in July 1979 at
a salary of $270 per week.  Clarry received several promotions
and pay increases over the years, and when Jeric began work in
May 1992, Clarry was a software consultant earning $800 per week,
while Jeric held the same position and earned $925 weekly.  When
plaintiff Jeric resigned in May 1994, Clarry was earning $885 per
week, while Jeric was paid $955 per week.

Plaintiff argues that she had superior education and
experience when compared to Clarry, and so she deserved a higher
salary.  This is true -- Jeric had two degrees in computer-
related fields, and had served as a senior software engineer for
about four years more than Clarry.  But, again, plaintiff's
argument proves too much -- the evidence shows that plaintiff
received higher pay for her superior qualifications, again
demonstrating the legitimate basis for Intergraph's salary
decisions.

Plaintiff also argues, mistakenly, that Clarry was paid more
than her in 1993.  Plaintiff arrives at this false conclusion by
taking her weekly salary during 1993 -- $925, then $955 -- and
multiplying it by the number of weeks in the year to arrive at a

33

figure of approximately $49,000. Plaintiff then points to a
February 3, 1997 letter drafted by defense counsel that discloses
that Clarry was paid $49,471 in 1993. (Plaintiffs' ev.
submission, Ex. F). However, plaintiff's argument misses the
point that the February 3, 1997 letter obviously includes
additional pay over Clarry's normal weekly salary for overtime
work. This fact is clear because the same letter lists Jeric's
pay for 1993 as $64,209, of which $10,602 was for moving
expenses. So, according to the letter, Jeric's salary for 1993
was approximately $4,000 more than Clarry's, even after
subtracting the money Intergraph paid to Jeric for moving
expenses. So, by either comparing weekly salaries or total
yearly compensation, Jeric made more money than Clarry in 1993.

So, to conclude, the evidence comparing Jeric's salary to
male employees at Intergraph shows that Jeric's pay was lower
than that of men who had superior education and experience, but
was higher than male employees with inferior qualifications.
This evidence, taken as a whole, permits no inference of
discrimination. Rather, the evidence here, like that with
respect to Davis, shows that Intergraph's salary decisions were
motivated by legitimate factors and not by gender. Defendant's
motion for summary judgment with respect to Jeric's Equal Pay Act

34

and Title VII claims based on unequal pay must be granted.[18]

## C. Retaliation Claims

Plaintiffs filed a written grievance with Intergraph on January 28, 1994, complaining of gender discrimination.  Both plaintiffs assert that Intergraph retaliated against them for filing this complaint.  Intergraph takes the position that there is no evidence of any retaliatory motive and that neither Davis nor Jeric suffered any adverse employment action that can be linked to retaliation.

Title VII retaliation claims, like other Title VII claims based on circumstantial evidence, follow the three-step burden shifting approach set forth in McDonnell Douglas: the plaintiff

---

[18]Plaintiffs' brief advances Tommy Siniard as a comparator for Jeric, despite the fact that Siniard was not listed in any response Jeric made to interrogatory #11.  However, even if the Court were to consider Siniard despite plaintiff's failure to list him as a comparator, his higher pay would support no inference of discrimination.  When Jeric was hired by Intergraph in May 1992, Siniard had been with the company for four years, and had been in the position of software consultant for approximately fifteen months.  Siniard's higher pay was simply a result of his longer tenure at Intergraph.  However, it is interesting to note that Siniard's starting salary as a software consultant -- $924 per week -- was less than that Jeric received when she was hired into the same position.

establishes a <u>prima facie</u> case, the employer proffers its

legitimate, non-discriminatory reasons for the challenged

actions, and then the burden shifts to the plaintiff to prove

pretext.  <u>Meeks v. Computer Assocs. Int'l</u>, 15 F.3d 1013, 1021

(11th Cir. 1994).  A plaintiff makes out a <u>prima facie</u> case of

retaliation by showing (1) that she participated in protected

conduct, (2) that she suffered some adverse employment action,

and (3) that there is a causal link between the two.  <u>Id.</u>


### 1. Plaintiff Davis


Plaintiff Davis alleges that she was retaliated against

following her complaints of gender discrimination, although she

is still employed by Intergraph.  Her claim of retaliation is

based upon the following incidents: (1) according to Davis, her

supervisor, Barag Hadi, yelled at her and berated her during a

meeting with David Nawrocki in early 1994, just after she

complained to Intergraph about Hadi's discriminatory attitude;

(2) David Nawrocki, Intergraph's human resources official charged

with investigating plaintiffs' complaints, did not accurately

report statements made by another Intergraph employee, Joe

Michael; (3) Davis' supervisors continued to deny her leadership

36

opportunities; and (4) Davis received a performance review with only a "solid" rating in January 1996 from another supervisor, Tommy Siniard.

The principal flaw in Davis' claim of retaliation is that she can show no adverse employment action causally linked to her complaint of gender discrimination. Davis' assertion that Baraq Hadi yelled at her and criticized her in one meeting just after her complaint does not show any adverse employment action. Similarly, the fact that David Nawrocki may not have investigated plaintiffs' complaints to Davis' satisfaction does not constitute an act of retaliation.

Davis' allegation that she was denied leadership opportunities after she filed her complaint with Intergraph also cannot form the basis for a retaliation claim, because Davis alleges that she was denied such opportunities both before and after she complained about gender discrimination. (See plaintiffs' responses to interrogatory #11). Since, according to Davis, she was treated similarly both before and after she complained about gender discrimination, she cannot establish the necessary causal link between her complaint and these adverse employment actions.

Finally, Davis complains that she was given a negative

37

performance evaluation in January 1996, approximately two years

after she complained to Intergraph about gender discrimination.

Davis' previous evaluations had all been "excellent," while her

January 1996 evaluation was "solid."  Although her January 1996

evaluation was not as good as her prior ones, Davis cannot

realistically contend that this evaluation was an adverse

employment action.  This conclusion is further buttressed by the

fact that Davis received a pay increase in September 1996.  In

addition, the fact that Davis has received a promotion and three

pay increases since January 1994 tends to prove that there was no

retaliation against her.

Because Davis can bring forth no evidence that she suffered

an adverse employment action that was causally related to her

complaints about gender discrimination, Intergraph's motion for

summary judgment is due to be granted with respect to Davis'

Title VII retaliation claim.


2. Plaintiff Jeric


Plaintiff Jeric resigned her position at Intergraph on May

31, 1994 and took a position with a slightly higher salary (but

less favorable benefits) at another company.  She claims that the

incidents of discrimination and retaliation she suffered were so severe that she was constructively discharged.  Intergraph argues that there is insufficient evidence of either retaliation or constructive discharge.

Jeric alleges that her supervisor, Baraq Hadi, retaliated against her in two ways: (1) on two occasions after she filed her complaint with Intergraph, Hadi yelled at her and berated her;[19] and (2) Hadi monitored Jeric's bathroom breaks.  In addition, Jeric testified in her deposition that another supervisor, Lon Opp, humiliated her in front of co-workers by implying that she had stolen a piece of equipment.  When Jeric resigned from Intergraph in May 1994, she stated on her exit interview form that discrimination and retaliation were her reasons for leaving. (Plaintiffs' ev. submission, ex. S).

This evidence, even if accepted, does not make out a claim for retaliation.  Hadi's behavior in yelling at plaintiff on two occasions and monitoring her bathroom breaks cannot constitute an

---

[19]According to Jeric, on the first of these occasions, Hadi was unaware that plaintiffs had complained about gender discrimination; he was angry because plaintiffs had bypassed him in the chain of command and had spoken directly to his supervisor.  (Jeric Depo. at 123-25).  On the other occasion, Hadi became upset and said that the four plaintiffs were conspiring against him.  (Id. at 139-40).

39

adverse employment action.  Opp's action in grabbing plaintiff's

hand and accusing her of stealing office equipment similarly

fails to rise to the level of an adverse employment action.

Without some sort of action that affected the terms and

conditions of her employment in a substantial way, Jeric cannot

take her claim of retaliation to the jury, and Intergraph's

motion for summary judgment must be granted with respect to this

claim.

Finally, there is no evidence in the record from which a

reasonable trier of fact could conclude that Jeric was

constructively discharged.  Jeric testified in her deposition as

follows concerning her decision to leave Intergraph:

> During that meeting with Mr. Nawrocki, I
> gathered from his conversation and comments
> made at that meeting that there was going to
> be no action taken against Baraq Hadi for the
> discrimination or retaliation.  Mr. Nawrocki
> was well aware of the retaliatory episodes
> that I have been describing to you since they
> started occurring.
>    And all -- all it looked like he was
> going to do was give Baraq a few tools to
> improve his management techniques and to
> improve his communication skills.  And it did
> not look like there was going to be a good
> outcome for me in -- in that I would continue
> to be retaliated against, I would probably be
> fired for some flimsy excuse, and that Baraq
> would continue to -- to manage in his present
> position without any punishment or any kind
> of, you know, change at the request of the

40

> company.  He was not being disciplined, and
> he would not be.
>      And so I -- I was in definite fear of my
> job and my livelihood and my ability to earn
> a living and to support my family, and so I
> began to look for another job.

(Jeric Depo. at 213-14).

In order to prevail on a claim of constructive discharge, a plaintiff must show that the employer deliberately made her working conditions intolerable, and must show that those conditions were so intolerable that a reasonable person would have felt compelled to resign.  E.g., Borque v. Powell Elec. Mfg. Co., 617 F.2d 61, 65 (5th Cir. 1980).  The burden on a plaintiff seeking to establish a constructive discharge is an onerous one because "society and the policies underlying Title VII will be best served if, wherever possible, unlawful discrimination is attacked within the context of existing employment relationships."  Id. at 66.

Here, the evidence presented by Jeric does not create a triable issue of constructive discharge.  Jeric testified that she left Intergraph because she was dissatisfied with Intergraph's failure to discipline her supervisor, and because she was afraid that she might be terminated in the future. Jeric's testimony establishes that she did not leave because her

working conditions were intolerable, but because of her own speculation about what Intergraph might do in the future. Jeric's testimony about her motivation for leaving Intergraph negates any possibility that a reasonable trier of fact could conclude that she was constructively discharged.  Intergraph's motion for summary judgment is due to be granted with respect to Jeric's constructive discharge claim.


## V. Conclusion


For the reasons stated above, Intergraph's motion for summary judgment will be granted with respect to the following claims:

(1) any Title VII claims arising from employment actions taken by Intergraph prior to November 17, 1993;[20]

(2) plaintiffs' claims under the Equal Pay Act;

(3) plaintiff's Title VII claims based on unequal pay because of gender;

(4) plaintiffs' retaliation claims; and

---

[20]Although plaintiffs cannot recover for any discrimination that occurred prior to November 17, 1993, evidence of discrimination that occurred prior to that time may be admissible under Fed. R. Evid. 404(b).

(5) plaintiff Jeric's constructive discharge claim.

A separate order will be entered accordingly.

Remaining in this case for trial will be the claims of both Davis and Jeric that, after November 17, 1993, they were denied promotions and work assignments because of their gender, in violation of Title VII.  Any recovery by plaintiff Jeric will be limited to the period between November 17, 1993 and May 31, 1994. The Court expects both plaintiffs to base their claims on the incidents of denied promotions and work assigments listed in their responses to interrogatory #11, and any proper supplementation to those responses.

Finally, the Court notes that the parties are in apparent agreement that this case present some sort of "hostile work environment claim."  Although there is no evidence in the record that there was any sexual harassment directed at plaintiffs, plaintiffs apparently take the position that the environment of discrimination, coupled with sporadic comments by Hadi and Opp, constituted a "hostile work environment," as that term is used in the Title VII context.  The Court disagrees and is obligated to correct the parties' mutual mistake in this regard.

Under Title VII, a hostile work environment claim requires evidence of severe, pervasive, and gender-charged conduct that

43

permeates the workplace to such an extent that the terms and conditions of the plaintiff's employment are affected. <u>Edwards v. Wallace Community College</u>, 49 F.3d 1517, 1521 (11th Cir. 1995). Here, plaintiffs allege that they were discriminated against with respect to promotions and job assignments, and identify four or five comments made by Hadi and Opp indicating a discriminatory attitude toward women. This evidence, while all probative with respect to plaintiffs' Title VII claims based on promotions and work assignments, cannot possibly be construed to make out a claim for a hostile work environment. The behavior alleged by plaintiffs is simply too sporadic in nature to be characterized as creating an "atmosphere charged with [gender-based] hostility." <u>See E.E.O.C. v. Beverage Canners, Inc.</u>, 897 F.2d 1067, 1068 (11th Cir. 1990). Plaintiffs' claims will proceed to trial on the claims that they were denied promotions and work assignments, and not on a hostile environment claim not even mentioned in the complaint.

DONE this _____11ᵗʰ_____ day of July, 1997.

_____

SENIOR UNITED STATES DISTRICT JUDGE

44